DISCIPLINARY COUNSEL *v.* PACE.

[Cite as *Disciplinary Counsel v. Pace,*
103 Ohio St.3d 445, 2004-Ohio-5465.]

(No. 2004–0824—Submitted June 29, 2004—Decided October 27, 2004.)

---

**Per Curiam.**

{¶ 1} Respondent, Don Haywood Pace of Sedona, Arizona, Attorney Registration No. 0025708, was admitted to the practice of law in Ohio in 1964. On September 15, 2003, relator, Disciplinary Counsel, filed an amended complaint charging respondent with violations of the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline considered the cause on the parties' consent-to-discipline agreement. See Section 11 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). The board agreed with the panel's recommendation to accept the agreement, including the stipulated misconduct and suggested sanction.

{¶ 2} The board found, consistent with the parties' agreement, that respondent had incorporated American Insurance Group, Inc. ("American"), an insurance holding company, in 1988. Respondent was originally the only financial investor and shareholder of American, but the company gradually drew other investors, and by September 1992, American's shares were being publicly traded. At that time, respondent owned more than 19 percent of the outstanding shares and was the largest investor in the company.

{¶ 3} American Bonding Company ("ABC"), a wholly owned subsidiary of American, provided surety bonds to construction contractors on federal, state, and local government projects. From approximately 1988 until 1994, respondent served as president and chief executive officer of American, which was renamed Pace American Group, Inc., in 1993, and vice president of ABC.

{¶ 4} In 1991, ABC entered into a reinsurance treaty whereby ABC would reinsure and share the risks of a certain class of bonds issued by a surety company headquartered in Mexico. Pursuant to the terms of the treaty, the Mexican surety company collected and retained control of all premiums until the bond was exonerated or a claim made. If no claim was made under the bond after the expiration of its term, a percentage of the premium was transmitted to ABC.

{¶ 5} At some point, respondent, Mauricio Madero O'Brien, the owner and chairman of the Mexican surety company, and other executives of both ABC and the surety company agreed that a greater return could be obtained while the premiums were held by the surety company if the funds were transferred and deposited into a securities brokerage firm in Mexico. Thus, in 1991, two accounts

were opened in a securities brokerage firm in Mexico: one in the name of ABC, the other in the name of American.

{¶ 6} During 1991 and 1992, at O'Brien's request, respondent advanced funds in excess of $38,000 to the Mexican surety company and O'Brien. In May 1992, while traveling abroad with O'Brien for business, respondent reminded O'Brien that he needed to repay the money that respondent had advanced. O'Brien assured respondent that upon his return to Mexico, he would arrange for transfer of the funds due respondent.

{¶ 7} Respondent was out of his office traveling on business from the end of April 1992 to the end of September 1992, including trips abroad. During this time, respondent's assistant handled all of his banking. In May and June 1992, the surety company wire-transferred a total of $36,659.28 from the securities brokerage accounts in Mexico to respondent's personal bank account in Cleveland, Ohio. Respondent was advised in October 1992 that these deposits came from Mexico, but he did not realize until March 1994 that the funds had come from the American and ABC securities brokerage accounts.

{¶ 8} In 1992, respondent told his accountant that he did not have any personal income from, financial interest in, or signatory authority over any foreign bank accounts. The accountant included this representation in respondent's 1992 federal tax return, and respondent signed the return as accurate.

{¶ 9} On or about April 6, 1997, a federal grand jury filed an 81–count indictment against respondent, charging him with conspiracy to commit mail fraud, mail fraud, wire fraud, money laundering, subscribing a false tax return, and forfeiture. Respondent was acquitted of 78 counts, and his conviction was vacated on appeal on two counts. See *United States v. Pace* (C.A.9, 2002), 314 F.3d 344. As to Count 81, respondent was convicted of failing to disclose on his 1992 personal tax return that he had an interest in or signature authority or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account. On April 21, 2003, after his appeal, respondent was sentenced to a two-month term at a minimum-security facility and one year of supervised release.

{¶ 10} On October 4, 2001, we suspended respondent's license to practice law for an interim period, pursuant to Gov.Bar R. V(5)(A), based on his having been convicted of a felony. *In re Pace* (2001), 93 Ohio St.3d 1440, 755 N.E.2d 903.

{¶ 11} While the criminal case was pending, respondent and the IRS litigated in federal tax court the validity of deficiency notices he had received for tax years 1990 through 1994, including the government's claim that the $36,659.28 transferred to respondent from Mexico in 1992 was unreported income. On April 26, 1999, the tax court held that respondent was entitled to a substantial refund of the taxes he had paid in the years 1991, 1992, and 1994.

{¶ 12} The board found, as submitted by the parties, that respondent had violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) and 1–102(A)(6) (a lawyer shall not engage in conduct that adversely reflects upon his fitness to practice law).

{¶ 13} In recommending a sanction for this misconduct, the board considered the stipulated mitigating features of respondent's case. The board found that respondent had practiced law for more than 35 years and has no prior disciplinary record, BCGD Proc.Reg. 10(B)(2)(a), and that respondent cooperated completely in the disciplinary process, BCGD Proc.Reg. 10(B)(2)(d). The board also took into account that by the time the parties executed the consent-to-discipline agreement, respondent's license to practice law had already been suspended for 28 months. BCGD Proc.Reg. 10(B)(2)(f). The board did not find any aggravating factors. BCGD Proc.Reg. 10(B)(1).

{¶ 14} For this misconduct, the parties suggested that respondent's law license be suspended for a period of two years but that he be given credit for the suspension he has been under since October 4, 2001. The parties acknowledged that acceptance of this recommendation would make respondent eligible to apply for reinstatement immediately upon the entry of a final order of discipline in this case. The panel recommended this sanction, and having found the cited misconduct, the board also recommended a two-year suspension with credit for time already served under suspension.

{¶ 15} Upon review, we agree that respondent violated DR 1–102(A)(4) and (6) and that a two-year suspension with credit for suspension time served is appropriate. A two-year suspension from the practice of law is a significant penalty, and respondent's license has already been suspended for more than two years for his misconduct. Accordingly, respondent is hereby suspended from the practice of law in Ohio for two years; however, we allow credit for the suspension he has been under since our order of October 4, 2001. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

———————

Jonathan E. Coughlan, Disciplinary Counsel, and Lori J. Brown, First Assistant Disciplinary Counsel, for relator.

Don Haywood Pace, pro se.